IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL SERAFINI, LEO DEL SERRA, :
VINCENT BURNEY :
    Plaintiffs :
     :
  v.  :  3:CV-08-0469
     :  (JUDGE VANASKIE)
RENATO MARIANI :
    Defendant :

## MEMORANDUM

Plaintiffs Michael Serafini, Leo Del Serra, and Vincent Burney bring this action against their former business associate, Defendant Renato Mariani, asserting various claims arising from the surrender of Plaintiffs' shares of Eagle National, Inc. ("Eagle") stock. All parties to this action formed Eagle in the late 1990's with the intention of starting a new business venture. Eventually, Eagle went into business with Mr. William Gilchrist, operating a truck stop. For reasons that are disputed, Plaintiffs effected a transfer of their Eagle shares to Mr. Mariani in 2001. Seven years later, Plaintiffs filed this suit seeking the return of their Eagle stock from Mr. Mariani, who denies having any obligation to return the stock in question. Mr. Mariani has moved for summary judgment, arguing that Plaintiffs' claims are both untimely and unsubstantiated. For the reasons that follow, Defendant's motion for summary judgment will be granted.

## I. BACKGROUND

The facts are largely undisputed.[1]  Prior to January, 1996, Plaintiffs worked at

Empire Sanitary Landfill ("Empire"), located in Lackawanna County, Pennsylvania, in

various positions.  (Dkt. Entry 26, Defendant's Amended Statement of Material Facts

("DSMF") ¶ 2.)[2]  Mariani was the President and a shareholder of Empire.  (Id. at ¶ 1.)[3]

Around the Fall of 1996, as Empire was being sold to another waste management

company, Plaintiffs and Defendant formed Eagle, a subchapter "S" corporation.  (Id. at ¶¶ 3-

4.)  On or about January 2, 1997, Eagle issued stock to Plaintiffs and Defendants.  (Id. at ¶

6.)  Mr. Serafini, Mr. Burney, and Mr. Del Serra each received 100 shares of non-voting

stock, while Mr. Mariani received 50 shares of voting stock and 50 shares of non-voting

stock.  (Id.)  Mariani was awarded voting stock because he provided nearly all the funding

---

[1] Defendant, in compliance with Local Rule of Court ("L.R.") 56.1, filed a comprehensive statement of material facts claimed to be undisputed.  (Dkt. Entry 26.) Plaintiffs, also in compliance with L.R. 56.1, filed a response that admitted 54 of the 70 assertions of fact made by Defendant.  (Dkt. Entry 29.)

[2] The Court will cite to the Defendant's Amended Statement of Material Facts when there is no genuine dispute as to the facts.  Otherwise, the Court will cite to the record or Plaintiffs' Statement of Disputed Material Facts ("PSMF").

[3] For the convenience of the reader of this memorandum opinion in electronic format, hyperlinks to the Court's record and to authority cited herein have been inserted.  The Court accepts no responsibility for, and does not endorse, any product, organization, or content at any hyperlinked site, or at any site to which that site might be linked.  The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

for Eagle.  (Id. at ¶ 8.)  The parties agree that each person owned 25% of the corporation, but Plaintiffs dispute Defendant's assertion that he maintained sole control over Eagle because he was the only person with voting stock.  (DSMF ¶ 8; PSMF ¶ 6.)  Eagle's Board of Directors consisted of Plaintiffs and Defendant. (DSM ¶ 7.)  The Board of Directors elected Serafini President and Del Serra Secretary and Treasurer.  (Id. at ¶ 10.)

Mr. Mariani entered into a business arrangement with Mr. William Gilchrist, Jr., to own and operate a truck stop.  (Id. at ¶ 15.)  On January 31, 1997, Eagle entered into a partnership agreement with BWJCJ, Inc., a Pennsylvania corporation.  Mr. Gilchrist was President of BWJCJ.  The partnership was known as Big Blue Partnership ("Big Blue").  (Id. at ¶ 16.)  Big Blue owned the land on which the truck stop was located.[4]  (Id. at ¶ 18.)  Mr. Mariani contributed the funds required for Eagle's participation in the partnership.  (Id. at ¶ 19.)  By the end of 1999, Mr. Mariani had advanced nearly $1,300,000 to Eagle.

The truck stop was managed by a separate entity, Big Ten Truck Stop, Inc. ("Big Ten").  Big Ten commenced operation of a Petro franchise truck stop on the land owned by Big Blue during 1997.  (Id. at ¶ 28.)  Although at one time Plaintiffs and Defendant had an ownership interest in Big Ten, in 1998, Plaintiffs transferred their shares in Big Ten to Mr. Mariani.[5]  (PSMF ¶ 25.)  As a result of the transfer of Plaintiffs' Big Ten shares, Mr. Mariani

---

[4] Eagle, through its ownership interest in Big Blue, owned 50% of the land on which the truck stop was located.  (DSMF ¶ 29.)

[5] The transfer of the stock in Big Ten is not at issue in this litigation.

3

owned 50% of Big Ten. Mr. Gilchrist, through BWJCJ, owned the remaining 50% of Big Ten, and he retained final decision making authority over Big Ten's operations. (Id. at ¶ 29; PSMF ¶ 29.)

Plaintiffs assert, and Defendant denies, that in 2001 a dispute between Gilchrist and Defendant arose concerning how the truck stop was being managed because the truck stop was not profitable. (Id. at 30 n.10; PSMF ¶ 31.) Plaintiffs maintain that, in order to facilitate Mr. Mariani's resolution of the dispute with Gilchrist, Mariani requested that the Plaintiffs surrender their stock in Eagle. (DSMF ¶ 32.) According to Plaintiffs, transfer of their stock would allow Mariani to deal exclusively with Gilchrist. (Compl. ¶¶ 7-9.)

On or about June 21, 2001, Plaintiffs went to the office of Attorney Albert Weinschenk, who was counsel for Eagle as well as Mariani's personal lawyer, and effected the stock transfer. (DSMF ¶ 33.) Specifically, by letter dated January 2, 2001, but executed on or about June 21, 2001 in Mr. Weinschenk's office, Serafini resigned as Eagle's President and Director, Del Serra resigned as Eagle's Secretary and Director, and Burney resigned as Director. (DSMF ¶ 33-4; Dkt. Entry 26, Attach. "16".) That same day, each Plaintiff signed an affidavit of lost stock certificate for 100 non-voting shares of Eagle, and counter-signed separate letters from Mariani to each Plaintiff "confirm[ing] that there are no outstanding obligations due me from you with respect to Eagle and no outstanding

4

obligations are due you from Eagle."[6]  (Dkt. Entry 26, Attach. "18".)  Additionally, the

surrendered shares were re-issued to Defendant.  (DSMF ¶ 37; Dkt. Entry 26, Attach. "23",

Weinschenk Dep. 30:7-32:22.)  It is undisputed that at the time of the stock transfer there

was no written commitment for the return of the stock by Mariani at some future date.

(DSMF ¶ 36.)

By the time of the alleged dispute between Mariani and Gilchrist, Plaintiffs were no

longer involved in the daily operations of the truck stop.  (Id. at ¶ 39.)  On February 14,

2002, Big Ten and Big Blue, jointly referred to as landlord, leased the truck stop to Scranton

Petro.  (Id. at ¶ 40.)   According to Mariani, the lease to Scranton Petro marked the end of

any alleged disagreement with Gilchrist.  (Id.)  Plaintiffs, however, deny knowing that the

dispute had been resolved.  (PSMF ¶ 60.)  In any event, Mariani moved on to become a

wholesaler of candy and tobacco products, and Plaintiffs remained employees in these

ventures, but without any ownership interest.[7]  (DSMF ¶ 42-3.)

Mariani, Serafini and Del Serra had also been linked as conspirators in a criminal

---

[6] It is undisputed that the purpose of the letters signed by Plaintiffs and Defendant
"was to release both Plaintiffs and Defendant from future liability in connection with the
Plaintiffs' transfer of their Eagle National stock back to the corporation."  (DSMF ¶ 35.)

[7] Eagle Diversified, not to be confused with Eagle National, Inc., was the entity that
entered the wholesale business and employed Plaintiffs after the truck stop was leased to
Scranton Petro.  (See, e.g. Dkt. Entry 26, Attach. "6", Serafini Dep. 56:3-23.)

prosecution that culminated with each pleading guilty.[8]  Each was sentenced to prison in

2002.

Before Serafini and Mariani surrendered to commence service of their prison terms,

Serafini approached Mariani and asked him to sign a handwritten document prepared by

Serafini.  (Mariani Dep. 91:15-23, Ex. "1".)  In the document dated July 2, 2002, Mariani

promises to keep Serafini's wife and son on "Eagles [sic] & Midvalleys [sic] Health

Insurance while we are away[.]"  (Id. at Ex. "1".)  The note also states that Mariani would

pay Serafini's legal fees, fines and restitution, continue to pay on a note issued to Mariani

from Serafini, and "[a]fter settleing [sic] with Billy Gilchrist to give back to you your 12.5%

stock in the truck stop after all of us are finished."[9]  (Id.)  On or about July 6, 2002, Mariani

and Serafini surrendered to authorities, (DSMF ¶ 48), and began serving their sentences at

the same location, Lewisburg.  (Id. at 49; PSMF ¶ 49.)

Shortly after Mariani and Serafini began serving their sentence,[10] Mrs. Serafini's and

---

[8] Burney was not implicated in the criminal prosecution.

[9] While Defendant Mariani disputes the authenticity of the document, for purposes of
this motion for summary judgment he admits to promising to provide health insurance to
Serafini's wife and child while Mariani and Serafini served their sentence.  (DSMF ¶ 51
n.14.)  Although acknowledging that his signature appears on this handwritten document,
Mr. Mariani claims that when he saw it the only subject covered was health insurance for
Mr. Serafini's wife and son.

[10] Mariani entered prison around July 6, 2002 and it is unclear when he was
released; Serafini was in prison from July 8, 2002 to April, 2004, (Serafini Dep. 77:24-78:1);
Del Serra was in prison from October, 2003 to December, 2004.  (Del Serra Dep. 97:16,

her son's health insurance coverage was terminated, resulting in a deterioration in the relationship between Mr. Mariani and Mr. Serafini. (DSMF ¶¶ 52-3.) While Mariani and Serafini were serving their sentence, the two never discussed Mariani's alleged promise to transfer back to Serafini his interest in the truck stop. (Id. at ¶ 54.)

Del Serra testified that after Serafini began his prison term (July 8, 2002), but before he began his own prison sentence (October, 2003),[11] Del Serra, Burney, and Serafini's mother, as a representative for the incarcerated Serafini, met with an area lawyer concerning the Eagle stock." (Del Serra Dep. 104:10-24.)  Because the Plaintiffs lacked funds, they did not pursue any course of action against Mariani with respect to the return of their Eagle stock. (DSMF ¶ 56.)

Serafini acknowledges that he had heard rumors that Mariani and Gilchrist had resolved their differences "and they were leasing the truck stop." (Dkt. Entry 26-6, Serafini Dep. 89:14-17.) In the Spring of 2007, approximately three years after Serafini was released from prison, Plaintiffs sent certified letters to Mariani, demanding return of their stock. (Id. at 90:11-91:10.) It is undisputed that the letters were returned to Plaintiffs unopened. (PSMF ¶ 67.) It is also undisputed that the letters sent in April of 2007 were the first attempt by Plaintiffs to secure a return of their Eagle stock. (Dkt. Entry 26-6, Serafini

_____

103:23-24.)

[11] Del Serra was granted bail pending his appeal of the sentence.

Dep. 91:23-92:1.)  Finally, Plaintiffs acknowledge that it was not until Mariani was served

with the complaint in 2008 that he learned that Plaintiffs sought the return of their Eagle

stock.  (DSMF ¶ 70.)

Plaintiffs brought this action on March 12, 2008.  Plaintiffs assert claims of

conversion (Count I), replevin (Count II), unjust enrichment (Count III), and constructive

trust (Count IV).[12] (Dkt. Entry 1.) Defendant filed an answer with affirmative defenses on

May 27, 2008.  (Dkt. Entry 8.)  On January 9, 2009, Defendant moved for summary

judgment.  (Dkt Entry 24).  The motion is ripe for adjudication.

II. ANALYSIS

A. Standard of Review

Summary judgment should be granted when "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c).  A fact is "material" if proof of its existence or nonexistence might affect the outcome

of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

---

[12] Under Pennsylvania law, a constructive trust is "one created by equity to prevent
unjust enrichment or to redress a wrong." Huber v. Wagner, 425 A.2d 456, 458 (Pa. Super.
1981).  "It is a remedy, not a separate cause of action." Kaiser v. Stewart, No. Civ. A. 96-
6643, 1997 WL 476455, *19 (E.D. Pa. Aug. 19, 1997) (citing Lerario v. Provident Life and
Accident Ins. Co., No. Civ. A. 96-2100, 1996 WL 532491, *4 (E.D. Pa. Sept. 20, 1996)).
Accordingly, Count IV will be dismissed.

(1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982). The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 256-57. Mere conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment. Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Summary judgment is to be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

B. Conversion (Count I)

Under Pennsylvania law, "conversion is the deprivation of another's right of property, or use or possession of a chattel, or other interference therewith, without the owner's consent and without legal justification." Universal Premium Acceptance Corp. v. York Bank & Trust Co., 69 F.3d 695, 704 (3d Cir. 1995) (citation and quotation omitted). The Third

9

Circuit has explained that:

> A person not in lawful possession of a chattel may commit conversion by intentionally dispossessing the lawful possessor of the chattel, by intentionally using a chattel in his possession without authority so to use it, by receiving a chattel pursuant to an unauthorized sale with intent to acquire for himself or for another a proprietary interest in it, by disposing of a chattel by an unauthorized sale with intent to transfer a proprietary interest in it, or by refusing to surrender a chattel on demand to a person entitled to lawful possession.

Baram v. Farugia, 606 F.2d 42, 43-4 (3d Cir. 1979). When a plaintiff succeeds in an action for conversion, title passes to the defendant, and the defendant must pay for the converted chattel. Id. at 44. "Conversion is therefore properly limited, and has been limited by the courts, to those serious, major, and important interferences with the right to control the chattel which justify requiring the defendant to pay its full value." Id.

### 1. Statute of Limitations

As a federal court sitting in diversity, this Court is "bound to follow the forum state choice-of-laws rules to determine the applicable statute of limitations and related law." Dranoff v. Merrill Lynch, Civ. A. No. 86-3048, 1986 WL 15014, *1 (E.D. Pa. December 31, 1986) (citing Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941); Cogwill v. Raymark Indus., Inc., 780 F.2d 324, 328 (3d Cir. 1985)). Our "Court of Appeals ha[s] determined that Pennsylvania state courts apply the Pennsylvania statute of limitations in all actions brought in Pennsylvania." Drankoff, 1986 WL 15014, *1 (applying Pennsylvania statute of limitations to stock conversion claim) (citing Ross v. Johns-Manville Corp., 766

10

F.2d 823, 826 (3d Cir. 1985)).

Under 42 Pa. Cons. Stat. Ann. § 5524, there is a two year statute of limitations period for, inter alia, "[a]n action for taking, detaining or injuring personal property, including actions for specific recovery thereof." 42 Pa. Cons. Stat. Ann. § 5524; Shonberger v. Oswell, 530 A.2d 112, 114 (Pa. Super. 1987) ("Conversion is an action at law and is, therefore, subject to the two-year statute of limitations.") (citing 42 Pa. Cons. Stat. Ann. §5542). Generally, "the statute of limitations begins to run when the cause of action accrues." Dranoff, 1986 WL 15014, *2. Under Pennsylvania law, "a cause of action for conversion does not accrue until there has been a demand for the goods and a refusal to deliver." Id.

Defendant Mariani maintains that Plaintiffs' conversion claim is barred by the two year statute of limitations. (Dkt. Entry 27, Def.'s Br. Supp. Mot. Summ. J. at 19-24.) Plaintiffs counter that "Defendant was entitled to hold the stock until all criminal matters had been resolved and the Plaintiffs requested the stock back."[13] (Dkt. Entry 30, Pltfs.' Br.

---

[13] Plaintiffs' complaint baldly asserts that "Plaintiffs agreed to and did sign their shares over to the Defendant to hold until a future date at which time the Plaintiffs would request the return of their stock." (Dkt. Entry 1, Compl. ¶ 9.) Thus, there is no dispute that the Plaintiffs voluntarily transferred their shares to Defendant. Regarding the demand for the return of the stock, Mr. Del Serra testified at his deposition that the understanding was that Mariani would return the stock "[o]nce we got back on our feet[,]" meaning "when we started turning a profit [at the truck stop.]" (Del Serra Dep. 48:3-11.) Del Serra first said that he "probably" never asked Mariani for the stock back, then backtracked and stated the he could not remember having asked for the stock. (Id. 48:16-23.) Plaintiffs have failed to

11

Opp'n Mot. Summ. J. at 5.)  In any event, the crux of the matter revolves around when the

Plaintiffs requested that Defendant return their stock.  Plaintiffs argue that, via two

registered letters which they purportedly mailed to Defendant in Florida in April, 2007, but

were returned unopened, they requested the return of their stock.  Alternatively, Plaintiffs

assert that the filing of this suit is sufficient to satisfy the demand and refusal elements of a

conversion action.  Defendant flatly denies receiving any such letters.  (DSMF ¶ 67.)

Demanding the return of personal property is an essential element of conversion.  In

Universal Computer Systems, Inc., the court explained:

> [O]ne in possession of a chattel as bailee or otherwise who, on demand,
> refuses without proper qualification to surrender it to another entitled to its
> immediate possession, is subject to liability for its conversion. A demand by
> one entitled to immediate possession and a refusal are necessary elements
> of the tort, and a person in possession of a chattel as bailee may be liable in
> spite of the fact that he obtained possession of the chattel in a lawful manner.
> Restatement Second of Torts, [§] 237, Comment.

Universal Computer Sys., Inc. v. Allegheny Airlines, Inc., 479 F. Supp. 639, 644-45 (M.D.

Pa. 1979).  As early as 1893, the Pennsylvania Supreme Court acknowledged that "[a]

demand in writing left at the defendant's house is sufficient.  Rice v. Yocum, 26 A. 698 (Pa.

---

present any evidence of the truck stop producing a profit.  Also, Del Serra testified that he
understood that his stock would be returned after Gilchrist and Mariani resolved their
differences.  (Id. at 83:9-20.)  Plaintiffs have failed to adduce any evidence when, if at
anytime, this alleged dispute was settled.  Nevertheless, the demand and refusal of the
return of the Eagle stock, as well as the initiation of this suit, are controlling regarding
Plaintiffs' conversion action.

1893). Plaintiffs' April, 2007 letters would appear to satisfy the demand requirement, even though returned unopened.

In any event, the initiation of this lawsuit is sufficient to sustain a conversion claim. In Beadling v. Moore, 93 Pa. Super. 544, 1928 WL 4454, *1 (Pa. Super. 1928), the Pennsylvania Superior Court noted that "[w]hile demand and refusal are evidence of the conversion of property, the fact of conversion may be proved by any evidence sufficient to support the inference, such as . . . denial of title, or assertion that title is in another." Importantly, the court declared that "[t]itle may be asserted by bringing suit, for 'a suit or action, according to its legal definition, is the lawful demand of one's right in a court of justice.'" Id. (quoting Appeal of McBride, 72 Pa. 80, 1872 WL 11552 (Pa. 1871)).

Defendant is correct to argue that "a party asserting a cause of action is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period." Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc., 468 A.2d 468, 471 (Pa. 1983) (citations omitted). "Thus, the statute of limitations begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations, even though a person may not discover his injury until it is too late to take advantage of the appropriate remedy." Id. (internal citations omitted). In this case, however, it was the demand for the return of the stock that

triggered the running of the statute of limitations, see Dranoff, 1986 WL 15014, *2, and the initiation of a law suit is an acceptable method for making a demand. See Beading, 1928 WL 4454, *1. Accordingly, the conversion claim is timely.

### 2. Merits of the Conversion Claim

As to the merits of Plaintiffs' conversion claim, however, Plaintiffs have failed to tender any evidence sufficient to support an inference that they have title to or a possessory interest in the stock. They acknowledge that they relinquished title to the stock when they returned it to the corporation. See United States Land Res., LP v. JDI Realty LLC, Civil Action No. 08-5162, 2009 WL 2488316 (D.N.J. Aug. 12, 2009) (rejecting conversion claim where plaintiffs could not show that defendants exercised ownership over partnership interests without plaintiffs' permission). They further admit that Eagle then issued the returned shares to Mariani. Thus, this is not a case where stock certificates were tendered to another to hold and return upon demand. An essential element of the claim for conversion is the claimant's superior right to the property, and Plaintiffs simply cannot establish such superior right under the circumstances presented here. The alleged promise to return the stock at some indefinite point in the future does not support a claim to ownership of the shares.[14] Nor is this a case where Mariani unlawfully acquired the shares

---

[14] Mariani does not concede that he promised to return the surrendered shares. He testified that he was told Plaintiffs were returning the stock for tax reasons. (Dkt. Entry 26-9, Mariani Dep. 66:13-20.)

in question.  It was a voluntary transaction supported by the parties' mutual exchange of promises to hold each other harmless in connection with their ownership of Eagle.

Under Pennsylvania law, "[t]he party claiming conversion must have had an immediate right to possession of the property at the time it was allegedly converted." Peoples Mortgage Co., Inc. v. Fed. Nat'l Mortgage Ass'n, 856 F. Supp. 910, 928 (E.D. Pa. 1994) (citations omitted).  In this case, Plaintiffs had no right to possession of the shares issued to Mariani by Eagle, having surrendered their ownership interest.

It may be that Plaintiffs have a breach of contract claim.  But "an action for conversion will not lie where damages asserted are essentially damages for breach of contract."  Montgomery v. Fed. Ins. Co., 836 F. Supp. 292, 301 (E.D. Pa. 1993) (citations omitted).  Where, as here, an alleged failure to tender property is premised upon an agreement, the failure to deliver the property represents a breach of an obligation imposed by the agreement, and not an interference with the claimant's dominion over the property. See Neyer, Tiseo & Hindo, Ltd. v. Russell, No. CIV. 92-2983, 1993 WL 53579, *4 (E.D. Pa. Mar. 2, 1993).  "[A] party cannot prevail on its action of conversion when the pleadings reveal merely a damage claim for breach of contract."  Id.  Moreover, where, as here, a party has not retained an ownership interest in the property delivered to another, it may not maintain an action for conversion of that property.  See Massive Paper Mills v. Two-Ten Corp., 669 F. Supp. 94 (S.D. N.Y. 1987).  Accordingly, Defendant is entitled to judgment on

the conversion claim.

C. Replevin (Count II)

"The action of replevin is founded upon the wrongful taking and detention of property and seeks to recover property in the possession of another." Valley Gypsum Co., Inc. v. Pennsylvania State Police, 581 A.2d 707, 710 (Pa. Commw. 1990). "Replevin is a possessory action in which the issues are plaintiff's title and right of possession. The primary relief sought is the return of the property itself, the damages being merely incidental." Id. (citing 17 Standard PA Practice 2d §§ 96:1-3). When an action is brought, "the question of title to personal property may be litigated in replevin." Winner v. Messinger, 69 A.2d 172, 174 (Pa. Super. 1949). Furthermore, the "issue must be strictly limited to title and right of possession, all matters foreign thereto must be excluded from consideration and are not available as defenses." Blossom Prods. Corp. v. Nat'l Underwear Co., 191 A. 40, 41 (Pa. 1937).

Defendant argues that, like the conversion claim, the replevin claim is barred by the two year statute of limitations. See 42 Pa. Cons. Stat. Ann. § 5524(3). Defendant also argues that the replevin claim fails as a matter of law.

There is no need to address the difficult issue of whether a cause of action for replevin accrues when the claimant has a right to demand return of the property, or when the defendant refuses a demand for its return. In this case, it is clear that the replevin claim

fails as a matter of law because Plaintiffs cannot show that Defendant had possession of the Eagle shares to which Plaintiffs at one time held title. Plaintiffs surrendered title in 2001 without retaining any ownership interest. "The gist of the action of replevin is to try the title to the chattels in question and the plaintiff's right to their immediate possession." Wilson v. Highway Serv. Marineland, 418 A.2d 462, 464 (Pa. Super. 1981) (citations omitted). Because Plaintiffs can show neither title to the shares nor a right to immediate possession, their replevin claim fails.

       D. Unjust Enrichment (Count III)

       Unjust enrichment is "essentially an equitable doctrine." Styer v. Hugo, 619 A.2d 347, 350 (Pa. Super. 1993). In order to show unjust enrichment, a "claimant must show that the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider." Hershey Foods Corp. v. Ralph Chapek, Inc., 828 F.2d 989, 999 (3d Cir. 1987) (citing Torchia ex rel. Torchia v. Torchia, 499 A.2d 581 (Pa. Super. 1985)). The Pennsylvania Superior Court has recently declared that:

> A claim for unjust enrichment arises from a quasi-contract. "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d 988, 991 (Pa.Super.2001).
>
> > The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and

acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. Whether the doctrine applies depends on the unique factual circumstances of each case. In determining if the doctrine applies, we focus not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

Moreover, the most significant element of the doctrine is whether the enrichment of the defendant is <u>unjust</u>. The doctrine does not apply simply because the defendant may have benefited [sic] as a result of the actions of the plaintiff.

Styer v. Hugo, 422 Pa.Super. 262, 619 A.2d 347, 350 (1993) (quotation marks omitted).

Stoeckinger v. Presidential Fin. Corp. of Delaware Valley, 948 A.2d 828, 833 (Pa. Super. 2008).

Defendant argues that Plaintiffs' claim for unjust enrichment fails as a matter of law because Plaintiffs cannot satisfy any of the unjust enrichment elements. Plaintiffs insist that the truck stop had been appraised as high as $14,000,000.00, and the Eagle stock is a valuable asset.

As a preliminary matter, the Court must determine whether the doctrine of unjust enrichment applies. Hence, the Court must determine whether Defendant Mariani was unjustly enriched. In this case, he was not.

Notably, from the outset, Mariani was the only Eagle partner to retain voting stock. Even though Del Serra, Serafini, and Burney were on the Board of Directors, Mariani necessarily controlled Eagle's actions. Moreover, Mariani was the only shareholder to

18

supply financing for Eagle. Del Serra testified that he invested either $2,500 or $7,500 in Eagle. (DSMF ¶ 20.) Serafini testified that he could not remember how much money, if any, he invested in Eagle. Also, Burney testified that he did not invest any money in Eagle. By way of contrast, Mariani loaned Eagle nearly $1,300,000 and placed at risk $3,000,000 to secure the truck stop's initial financing package. (DSMF ¶¶ 21-2.) There is no evidence that Eagle was profitable before Plaintiffs surrendered their shares, and there is unrebutted evidence that it had sustained losses through 1999. (Id. at ¶ 23.) There is no evidence that any Plaintiff made any considerable contribution to Eagle, and the surrendering of their shares relieved them of any potential liability. It is also undisputed that Mariani loaned the truck stop operation an additional $100,000 after Plaintiffs surrendered their stock. (Id. at ¶ 66.)

While Mariani undoubtedly received a passive benefit by acquiring all of Eagle's stock, it would not be unconscionable for Mariani to retain the stock.[15] When Plaintiffs met with Mr. Weinschenk, they voluntarily transferred their stock, which was re-issued to Mr. Mariani. At this point, Plaintiffs' divested themselves of their interest in Eagle. Mr. Mariani continued to shoulder the risk of his substantial investment. Plaintiffs took no action to

---

[15] In the unjust enrichment context, the word "benefit" means any form of advantage. See Zvonik v. Zvonik, 435 A.2d 1236, 1241 (Pa. Super. 1981) (citing Restatement (First) of Restitution § 1, Comment b). The transfer of the stock, plus the work Plaintiffs put into the truck stop as part of Eagle, constitutes a benefit received by Defendant. See Restatement (First) of Restitution § 1, Comment b.

recover their stock until seven years after they had relinquished it.  They bore none of the risk and it is not unconscionable to allow Mariani to retain the benefit of his investment.

Therefore, Plaintiffs' voluntary transfer of stock to Defendant cannot be grounds for an unjust enrichment claim.  Accordingly, Plaintiffs' unjust enrichment claim must fail.[16]

III. CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment will be granted.  An appropriate order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

---

[16] Plaintiffs also claim that Mariani took advantage of a confidential relationship with Plaintiffs.  Plaintiffs, however, have not presented any evidence sufficient to create an inference that Mariani had abused some "confidential" relationship he had with Plaintiffs.  In this regard, Plaintiffs were required to provide evidence that was "clear, direct, precise, and convincing."  Roberson v. Davis, 580 A.2d 39, 41 (Pa. Super. 1990) (quotation and citations omitted).  All they have shown is a business relationship with Mariani.  Of course, trust among business persons will not establish the type of confidential relationship on which to base a claim for constructive trust.  There is no evidence that Mariani took advantage of information related to him in trust or engaged in fraud or other wrongful conduct.  At most, Plaintiffs have presented evidence of a breach of a naked promise, but this is insufficient to sustain a cause of action.  Otherwise, any breach of promise would support a constructive trust claim, even though the promise is not otherwise actionable.  Plaintiffs have thus failed to carry their burden of demonstrating a genuine dispute of material fact on this question.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


MICHAEL SERAFINI, LEO DEL SERRA,        :
VINCENT BURNEY                          :
                    Plaintiffs          :
                                        :
        v.                              :        3:CV-08-0469
                                        :        (JUDGE VANASKIE)
RENATO MARIANI                          :
                    Defendant           :

ORDER

NOW, THIS 31st DAY OF MARCH, 2010, for the reasons set forth in the foregoing

memorandum, IT IS HEREBY ORDERED THAT:

1. Defendant's Motion for Summary Judgment (Dkt. Entry 24) is GRANTED.

2. The Clerk of Court is directed to enter judgment in favor of Defendant, and to

mark this case CLOSED.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge